UNITED STATES DISTRICT COURT          <u>FOR ONLINE PUBLICATION ONLY</u>
EASTERN DISTRICT OF NEW YORK

MAZOLTUV BORUKHOVA,

Petitioner,                    MEMORANDUM
<u>AND ORDER</u>
- versus -                    14-CV-4738 (JG)

WARDEN, Bedford Hills Correctional
Facility, ATTORNEY GENERAL OF THE
STATE OF NEW YORK,

Respondents.

A P P E A R A N C E S :

      ANDREW CITRON
             110 Wall Street, 11th Floor
             New York, NY 10005
      By:    Andrew Citron
             *Attorney for Petitioner*

      RICHARD A. BROWN
             District Attorney, Queens County
             125-01 Queens Boulevard
             Kew Gardens, NY 11415
      By:    Johnnette Traill
             *Attorneys for Respondent*

JOHN GLEESON, United States District Judge:

             Mazoltuv Borukhova petitions under 28 U.S.C. § 2254 for a writ of habeas

corpus.  Borukhova is presently incarcerated and serving a life sentence of imprisonment

pursuant to New York state criminal convictions following trial for first-degree murder and

second-degree conspiracy.  She argues that she was denied federal constitutional rights before,

during, and after trial.  I heard oral argument on the motion on May 22, 2015.  For the reasons

given below, Borukhova's petition is denied.

BACKGROUND

A.    *Facts of the Crime*

On the morning of October 28, 2007, Daniel Malakov was shot to death in a park in Queens while he was bringing his four-year-old daughter Michelle for a visit with his wife (and the girl's mother), petitioner Mazoltuv Borukhova. Borukhova and Malakov were separated, and Malakov had recently gained temporary custody of Michelle. As discussed in detail below, the government's evidence at trial proved that Borukhova hired Mikhail Mallayev, the husband of Borukhova's first cousin, to kill Malakov. Following a six-week jury trial, Borukhova was found guilty of first-degree murder and second-degree conspiracy on March 10, 2009. On April 21, 2009, she was sentenced to life imprisonment without parole on the murder count and an indeterminate prison term of eight and one-third to twenty-five years on the conspiracy count. Traill Aff. ¶¶ 4-12, ECF No. 8; *see also* T. 3985-86, 4793-4830.[1]

Borukhova and Malakov are Bukharian Jews, which is a sect of the Orthodox Jewish community. Borukhova was born in Uzbekistan and was 35 years old at the time of trial. She earned a medical degree in the Soviet Union, and after she emigrated to the United States in 1997 she obtained her license to practice medicine in New York and became board-certified in 2006. Malakov was an orthodontist. Borukhova and Malakov met in 2001 and were married shortly thereafter. Their only child, Michelle, was born in 2003. They separated in November 2003, reconciled, then separated again in April 2005. Pet. ¶¶ 22-23[2]; T. 3933-40, 1308-11.

Borukhova was tried jointly with Mallayev at a proceeding that began on January 26, 2009. The government presented 28 witnesses, including law enforcement officers,

---

[1]    "T." refers to the pages of the trial transcript (ECF Nos. 13-15, Feb. 25, 2015), and references preceded by "A." are to the Appendix submitted to the Second Department along with Borukhova's appellate brief (ECF No. 12, Feb. 25, 2015).

[2]    Citations to "Pet.," unless otherwise noted, refer to Borukhova's amended petition for habeas relief, ECF No. 4, Oct. 2, 2014. Borukhova's original petition appears at ECF No. 1, dated Aug. 8, 2014.

Malakov's family members, three eyewitnesses, and custodians of record. The defense case centered on Borukhova's own testimony and the testimony of seven other witnesses who supported Borukova's version of events. Mallayev did not testify in his own defense. On March 9, 2009, the case went to the jury, which found Borukhova and Mallayev guilty of first-degree murder and second-degree conspiracy the next day. Mallayev was also sentenced to life without parole. T. 4793-4830, 4890.

B.      *The Government's Case*

          1.      *The Custody Battle*

          Borukhova and Malakov married in 2001, had Michelle in 2003, and separated less than a year later. Malakov filed for divorce in 2003. Borukhova had custody of Michelle following the separation, while Malakov had supervised visitation rights. T. 1312-17, 2318-23.

          Michelle's law guardian, David Schnall, testified that Borukhova persistently sabotaged Malakov's relationship with Michelle. In April 2007, Schnall recommended that Malakov be awarded unsupervised visitation rights over Michelle, to which Borukhova objected. At the next Family Court date, October 3, 2007, Judge Sidney Strauss issued a temporary order taking custody of Michelle away from Borukhova and awarding it to Malakov. The court's decision detailed Borukhova's attempts to undermine Michelle's relationship with Malakov and Borukhova's "overbearing" attitude and "smothering" of Michelle. The court ordered the custody transfer to take place on October 22, 2007, six days before the murder. T. 2326-36, 2374-88, 2432-35.

          Borukhova hired a public relations firm to film the transfer. The video was a "protracted, traumatic, and highly emotional display for the camera, during which petitioner repeatedly incited the child, woke her up when she fell asleep, and literally pulled on the

screaming four-year-old's legs while [Malakov] was holding her." Resp. Br. at 19, ECF No. 8, Feb. 11, 2015.

2. *The Eyewitnesses' Testimony*

The prosecution offered testimony from three eyewitnesses to the crime. The first was Marisole Ortiz, whose daughter was Malakov's first patient on the morning of the murder. Ortiz testified that she was surprised to see Malakov and Michelle leave the office after her appointment and walk towards the park on Yellowstone Boulevard at 64th Road. As she was getting into her car, Ortiz noticed a woman wearing dark clothing walking towards Malakov and Michelle. T. 1401-05, 1424-26.

Two other eyewitnesses, Cheryl Springsteen and Natalie Tabois, testified they saw a dark-clothed woman standing with a girl in the park. Springsteen and Tabois were both near the park walking with their dogs. Springsteen was also with her boyfriend. Springsteen and Tabois described the woman as having short, curly, reddish hair. Tabois testified that while the girl stood with the dark-clothed woman, Malakov appeared to be waiting for something a few feet away from them. T. 1514-15, 1651-53, 1521-23.

All three eyewitnesses heard a loud bang that sounded like a muffled gunshot, then two more shots. Tabois said there was only a slight pause after the first shot. The witnesses saw the shooter standing in front of the victim, and Ortiz and Springsteen testified they saw the shooter holding a gun and watched him fire the last two shots. Tabois said she saw the shooter put something in his jacket after she heard the shots. All three saw Malakov fall to the ground and watched the shooter walk briskly away. T. 1411, 1417-22, 1514-15, 1519-20, 1524-30, 1638, 1659-65.

Ortiz and Springsteen testified that the woman and the girl were five to ten feet away from Malakov and facing him when the shooting happened. They testified that the woman

was calm after Malakov was shot and did not yell or try to help him. Ortiz said the woman stood still for a few seconds then pulled the girl toward her and walked into the park. T. 1426-27, 1667-68.

The witnesses described the shooter as a white, stocky man in a dark jacket. Ortiz said the man was about five feet nine or ten inches tall. Neither Ortiz nor Tabois could see the shooter's face. Tabois saw the shooter from behind and said he wore a small, black hat that looked like a yarmulke. Springsteen saw the shooter's face and she later identified Mallayev as the shooter in a lineup and at trial. She was the only witness to identify Mallayev. After the shooting, Springsteen told her boyfriend to call 911. Tabois ran to her apartment to get her cell phone to call 911. Ortiz ran back to Malakov's office to get help. When Ortiz got back to the park, she said no one was administering CPR to Malakov. T. 1422-23, 1428-30, 1524-33, 1638, 1660-65, 1669-70.

The eyewitnesses testified that after the shooting, they saw a woman approach the scene and began to run towards the victim when she saw him on the ground. Ortiz knew Malakov from the neighborhood but Tabois did not know him. At trial, Springsteen and Tabois identified Borukhova as the woman who approached Malakov after the shooting. They identified Sofya Borukhova ("Sofya"), Mazoltuv Borukhova's sister, in a photo array as the woman with red, curly hair who they saw before the shooting. T. 1399, 1522, 1535-36, 1542-43, 1672-74, 1678.

3.    *Events After the Shooting*

Police Officer Thomas Danielle arrived between 10:45 and 10:50 a.m. after he heard gunshots from several blocks away. When Danielle arrived, he saw a group of people standing around Malakov, but no one was administering CPR. Danielle testified that Borukhova walked around the corner and began to run as she saw Malakov on the ground. Borukhova did

not identify herself as Malakov's wife, but she said she was a doctor and told Danielle to call 911. She began to do CPR along with Danielle but then stopped when she learned the ambulance was approaching. EMT worker Susana Toriz testified that she started administering CPR when she got to the scene and Borukhova offered to help intubate Malakov. Toriz testified that Borukhova appeared to be calm when she offered to help. Malakov was taken to the hospital and died shortly after. T. 1089-1102, 1148-52, 1175-85.

Police Officer Jennifer Irving testified that after Malakov was taken to the hospital, Borukhova complained of chest pain and was taken to North Shore Hospital. Irving rode with Borukhova in the ambulance and said she appeared to be calm. Detective Ismet Hoxha interviewed Borukhova briefly at the hospital. Borukhova was calm and said she met Malakov on the street to pick up Michelle, then as she bent down to hug Michelle, she saw Malakov on the ground bleeding from the chest. Borukhova told Hoxha that she called 911 immediately and that she started to perform CPR on her husband, but she did not see anyone or hear any gunshots. Other evidence showed that Borukhova called 911 five minutes after the shooting but she did not provide any information to the operator, then she called again after others were present at the scene. Hoxha testified that Borukhova told him that she and Malakov were separated, that she was seeking a divorce, and that she had custody of Michelle at the time. Borukhova ended the interview because she said she was not feeling well, but she agreed that she would talk to Hoxha after being discharged. T. 3006-09, 3012, 3280, 3964, 4310-18.

After Borukhova was discharged, she accompanied Officer Irving to the precinct, where Detectives Hoxha and Wilkowski questioned her. They said that she appeared calm and not very interested in assisting in the investigation of Malakov's murder. Borukhova told Wilkowski that she had worked in the emergency room of White Plains Hospital the night before the shooting, then at 8:00 a.m. she went home, changed, and checked on patients at Forest Hills

Hospital. When she left there, she called Malakov and told him she was running late to pick up Michelle. She met him on the street in front of the playground. Borukhova said she was 10 to 15 feet away from Malakov when he was shot, but she was swinging her daughter around and did not see or hear anything. Borukhova asked the detectives to note that she gave Malakov CPR. During her interview with Hoxha at the hospital, Borukhova said that she had custody of Michelle. But when she was questioned at the police precinct, she admitted that Malakov had custody. When the detectives asked for more information, Borukhova said that she needed time to think things over and "get her story together." T. 2492-95, 2508-09, 3012-19.

After Borukhova left the precinct with Matthew Brissenden, the attorney her family had retained for her, she returned with her family about two hours later and demanded that Michelle be released to her. Hoxha and Sergeant Claudia Bartolomei testified that she refused to leave and took video and pictures of the officers inside and outside of the building. She was still in her car outside the precinct on the following morning. T. 2487-88, 2499-500, 3009, 3309-12.

4.    *Evidence of Borukhova and Mallayev's Plan*

On May 14, 2007, when the Family Court's decision over Malakov's visitation rights was pending, Borukhova met with Mallayev (who flew in from his home in Georgia for the meeting). Borukhova secretly taped the conversation. The tape was translated from Bukharian by the FBI and also by Borukhova when she testified. Borukhova testified that the conversation was related to a real estate transaction. The FBI translator testified that although portions of the tape were inaudible, he was able to translate the portions that he understood. The translator testified he could make out male and female voices on the tape. The male said he had a 6:00 a.m. return flight the next morning, and the tape also included phrases like "you need to be friendly," the female asks "is everything okay with you," and the male says "very good."

7

Other portions of the tape included the male saying "such situation will be much easier to deal with," and the female responds "I believe you." During summation, the prosecution argued that although parts of the recording were "unintelligible," it was significant that Borukhova taped the conversation. T. 3314-22, 3683-3708, 4009-19, 4668-72.

After the meeting between Borukhova and Mallayev, there was a $9,900 cash deposit made at Forest Hills Bank of America with the names Mira, Boris, and Mikhail Mallayev on the deposit slip. Then, on November 8, 2007, there were additional deposits made at a Bank of America branch located at Avenue U and East 21st Street. Mallayev deposited a total of $19,800 into multiple accounts, including accounts in the name of Mira and Boris Mallayev. He made deposits of $9,500 and $9,800 into the account of Boris Mallayev, and a $4,000 deposit into his own account. Each was short of the $10,000 reporting limit. T. 3469-84.

Borukhova's cell phone records revealed that following the order transferring custody of Michelle to Malakov, Borukhova exchanged 91 phone calls with Mallayev. Forty-two of the calls occurred on October 22 and October 23, 2007, the day of and the day after the transfer, and less than a week before the murder. On October 25, 2007, Mallayev drove to New York from Georgia and arrived at his friend Rafael Mosheyev's house unexpectedly. Mallayev told Mosheyev that he would stay until the following Sunday night, but he left the next morning without saying goodbye. The next morning, the day of the murder, Mosheyev called Mallayev at 11:00 a.m., and Mallayev said he was already "far away." Cell site records showed Mallayev was on the Belt Parkway, close to the crime scene, when Mosheyev called him. T. 1973-1974, 1986, 2745-2804, 3349, 3630.

On October 30, 2007, two days after the murder, Mallayev called Borukhova from his home in Georgia. He then returned to New York on November 6. Borukhova testified that Mallayev called her twice the next day and then visited Borukhova's office. The

prosecution presented bank records from Bank of America that showed that the next day, November 8, Mallayev went to a bank in Brooklyn and deposited $19,800 in cash into six different bank accounts. The prosecution also offered bank records that showed that at the time, Mallayev was over $2.5 million in debt and delinquent on his mortgage and credit card bills. T. 3473-3500, 3542-43, 3578, 4001-02, 4153.

After Mallayev was arrested on November 17, 2007, he was interviewed by Detective Wilkowski. He initially denied being in New York at the time of the murder. Later, he admitted being in New York but said that the calls between him and Borukhova were related to his wife's medical needs. T. 2549, 2562-74.

5. *Testimony from Malakov's Family*

Malakov's uncle, Ezra Malakov ("Ezra"), testified that on October 25, 2007, he saw Borukhova on the street. Borukhova told him that Malakov took away her child. When Ezra offered her help, Borukhova said she did not need the help because, "[Malakov's] days are numbered. Everything is decided about them." Khaika Malakov ("Khaika"), Malakov's father, testified that later that same day he was on the street with his wife when Sofya approached them and said that unless they "give the child back [they're] going to lose [their] son [this] Sunday." Khaika reported the threat to the police after Malakov's murder. T. 1353-55, 1378-89, 2451-56.

Khaika also testified that on the morning of Sunday, October 28, 2007, around 10:30 a.m., Malakov visited Khaika's house with Michelle. Malakov told Khaika he was going to give Michelle to Borukhova that day in the park, which was where Borukhova asked him to bring Michelle. T. 1334-37.

6. *The Additional Physical Evidence*

Detective Carlos Pantoja recovered a make-shift silencer from the crime scene on the day of the murder. The silencer was made of a plastic container wrapped in duct tape.

Alynka Jean, a criminologist employed by the New York Police Department, testified that she processed the item and recovered latent fingerprints on the duct tape, which she photographed and enhanced. Detective Bieniek testified that he matched the fingerprints obtained from the silencer to the fingerprints of Mallayev. T. 1228, 1240-41, 1826-36, 2125-26.

On November 19, 2007, the police searched Borukhova's apartment, Sofya's apartment, and their mother's apartment and recovered a microcassette recorder and tape of Borukhova's meeting with Mallayev. They also recovered a small, wearable "button" camera from Sofya's apartment. Bartolomei identified the voices on the microcassette recording as belonging to Borukhova and Mallevev. Bartolomei testified that he had the recording enhanced and then translated by the FBI, as explained above. T. 3325-32, 3733, 4014-19, 4668.

The police also searched Borukhova's office on November 19, 2007, and February 9, 2008. They seized medical files including files for Mallayev and his wife. The evidence showed that the files had been falsified and created after Mallayev's arrest for the purpose of providing an explanation for the large number of telephone calls he exchanged with Borukhova. Specifically, the only EKGs without correct time and date stamps that were seized from Borukhova's office were the two that belonged to Mallayev and his wife. T. 3064-70, 3127-28, 4172-4222.

C.      *Borukhova's Defense*

1.      *Borukhova's Testimony*

Borukhova denied making any threats to Malakov's family or having anything to do with Malakov's murder. She admitted there was a custody dispute over Michelle and said that turning over custody of Michelle to Malakov was very emotional for her. Borukhova repeated the account of events that she gave to the police regarding the morning of the shooting and what she did after she saw Malakov on the ground. Regarding the moments of the shooting

itself, Borukhova testified that she and Malakov were laughing and swinging Michele and then all of the sudden she "felt heavy." T. 3940, 3946-58. She continued:

> He said something very, very brief and from standing, um, next to us he let [Michelle] – he dropped her feet and buttocks which he was holding and he, um – and from being on my side he run on the middle of the street. There was a park – car parked but he run almost in a – in the middle of the road on 64th and he was facing me and now I'm looking at him and, uh, and he's looking at me and – and I look at him. His face is pain and I see his face is like torturing, like twitched in pain. I was looking at him and, uh, and he's holding his chest like this and – but when – then the hands I see the blood and, uh, I don't remember all my actions but I remember taking Michelle and running but when I was running I was still looking at him. I was – and I saw him. He made a few steps and he fell down on the ground.

T. 3958.

Borukhova denied that she made arrangements for her sister Sofya to be at the park that morning. She explained her reason for buying the button camera was that her therapist recommended she document the transfer between her and Malakov, and she wanted to do so in a way that Michelle would not notice. She did not have it with her on the day of the shooting.[3] T. 3968, 3972-74.

Borukhova testified that she was interviewed at the hospital and then at the precinct. To explain the large volume of calls between her and Mallayev, Borukhova testified that she was the physician for Mallayev and his wife and was treating Mrs. Mallayev for high blood pressure and chest pains. Borukhova saw the Mallayevs in her office in May and October 2007 and performed EKGs on them; she saw them again on November 7, 2007, to pick up lab results. She testified that the date and time stamps on the EKG printouts were incorrect because she had not set up the stamp on the machine. Borukhova said there were so many calls because

---

[3] The prosecution used Borukhova's testimony about the button camera to argue that because she was trying to make the camera work, she was late to the park on the morning of the shooting, and that was why she asked Sofya to go to the park first. T. 4691-95.

Mallayev's wife called her to complain of chest pain, and she thought the calls ended after October 28 because people stopped calling her after she was accused of Malakov's murder.  T. 3985-98, 4001-02, 4153-61.

2.    *Additional Testimony*

Borukhova called Sal Marino, a private investigator who made a sketch of the crime scene.  Attorney Matthew Brissenden testified that he was retained to represent Borukhova by Borukhova's family.  Arthur Natanov, Borukhova's brother-in-law, testified that he shared his dental office with Borukhova and he had treated Mallayev and his wife.  Two of Borukhova's colleagues, Dr. Daniel Berman and Dr. Charlotte Malasky, testified as character witnesses on her behalf.  Finally, Louis Marin, an EMT who arrived at the crime scene after the shooting, testified that Borukhova was not calm, but instead described her as "panicky" and "hyperventilating."  T. 3844-45, 3860-62, 3895-3904, 3910-14, 3921-24, 4412-13.

D.    *Subsequent Procedural History*

Following her conviction, Borukhova moved to set aside the verdict pursuant to § 330.30 of the New York Criminal Procedure Law.  She argued that the judge should have recused himself since he had two children who worked for the Queens County District Attorney's Office and that the evidence was legally insufficient to establish her guilt.  Traill Aff. ¶¶ 7-9.  The court denied the motion on April 28, 2009.  *Id*. ¶ 10.  On April 21, 2009, the court sentenced Borukhova to life imprisonment without parole on the murder conviction and a consecutive indeterminate term of eight-and-one-third to 25 years' imprisonment on the conspiracy conviction.  *Id*. ¶ 12.

Borukhova appealed her conviction to the Second Department.  On October 25, 2011, the Second Department affirmed her conviction, holding as follows:

1. Borukhova's statements at the precinct on the day of the murder should not have been suppressed on the ground that Borukhova was in custody because the duty to administer *Miranda* warnings was not triggered since a reasonable person would not have believed she was in custody;

2. Instead, Borukhova's statements at the precinct should have been suppressed because they were obtained in violation of her right to counsel. Her right to counsel attached on the day of the murder at 1:17 p.m. when the attorney retained by the defendant's sister, Matthew Brissenden, called the precinct, identified himself as Borukhova's attorney, and requested that she not be questioned until he could speak to her. The right attached even though Borukhova said she had not called an attorney because she did not make an unequivocal rejection of the representation;

3. Even though Borukhova's statements should have been suppressed, the error was harmless because the proof of Borukhova's guilt was "overwhelming, and there is no reasonable possibility that the jury would have acquitted her had it not been for this constitutional error . . . .";

4. Khaika's testimony that Sofya threatened Malakov's family before his death was erroneously admitted by the trial court in the absence of a limiting instruction to the jury that the statement could only be considered for the conspiracy charge and not for its truth;

5. Even though Khaika's testimony was inadmissible hearsay, the error was harmless because the evidence of the defendant's guilt was overwhelming and there was "no significant probability that she would have been acquitted had it not been for the nonconstitutional error in admitting Sofya's statement";

6. Khaika's testimony that, on the morning of his murder, Malakov told him he was bringing his daughter to the park for Borukhova to pick her up was properly admitted into evidence under the state-of-mind exception to the hearsay rule;

7. The trial court did not err in allowing Michelle's attorney to read to the jury the family court decision removing temporary custody from Borukhova because the decision was not offered for the truth of the statements but rather to show Borukhova's state of mind upon hearing the decision;

8. The trial court did not violate Borukhova's right to testify on her own behalf when it sustained objections to questions asked during the her direct examination about why she took certain actions because Borukhova was able to adequately explain her actions and give her attorney enough material for use in his closing argument;

9. Borukhova was not deprived of her right to a fair trial or the effective assistance of counsel when her attorney had to prepare and deliver his

summation the day after the close of evidence instead of being given the weekend to prepare;

10. Borukhova's argument that she was deprived of her right to a public trial when the trial court temporarily excluded observers from the courtroom during voir dire because there were no available seats was unpreserved for appellate review because of her attorney's failure to make a contemporaneous objection;

11. Borukhova's argument that the evidence was insufficient as a matter of law was also unpreserved for appellate review because of her attorney's failure to make a contemporaneous objection;

12. The guilty verdict was not against the weight of the evidence;

13. Borukhova failed to preserve her constitutional challenges to the trial court's refusal to hold a hearing to determine the reliability of the proposed fingerprint evidence and to the rulings that limited the scope of Mallayev's cross-examination of the prosecution's fingerprint experts; and

14. Borukhova's remaining arguments were meritless.

*People v. Borukhova*, 931 N.Y.S.2d 349, 362-73 (2d Dep't 2011).

A judge of the New York Court of Appeals denied leave to appeal on January 18, 2012, 18 N.Y.3d 881 (2012) (Smith, J.), and denied a motion for reconsideration of that denial on March 14, 2012. 18 N.Y.3d 955 (2012) (Smith, J.). On March 19, 2013, Borukhova moved to vacate her judgment of conviction pursuant to § 440.10 of the New York Criminal Procedure Law, raising a number of claims that do not appear in this petition. The motion was denied on August 6, 2013. *See* Pet. ¶ 7; Traill Aff. ¶ 27. *See also People v. Borukhova*, No. 336/2008 (Sup. Ct. Queens Cnty. Aug. 6, 2013). The court denied Borukhova's § 440.10 motion on August 6, 2013. *Id.* ¶ 30. The Second Department denied leave to appeal the August 2013 decision on July 9, 2014. *Id.* ¶ 31.

This petition followed on August 8, 2014, and was amended on October 2, 2014. *See* ECF Nos. 1 & 4. Borukhova's petition raises all of the grounds she asserted in her brief to the Second Department. Oral argument occurred on May 22, 2015.

DISCUSSION

A.    *Standard of Review*

     1.    *Exhaustion and Procedural Default*

The exhaustion requirement, codified at 28 U.S.C. §§ 2254(b) and (c), obligates a federal habeas petitioner to exhaust state judicial remedies before seeking relief from a federal court. To exhaust state remedies, a petitioner must "fairly present" her federal constitutional claims to the highest state court with jurisdiction over them. *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (internal quotation marks and alteration omitted); *see also Daye v. Attorney General of New York*, 696 F.2d 186, 191 (2d Cir. 1982) (*en banc*). This requirement, which "springs primarily from considerations of comity" between the federal and state systems, *id.* at 191, affords the state courts "the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Duncan*, 513 U.S. at 365 (quotation marks and citation omitted).

As part of this requirement, a federal habeas court may not "review a claim rejected by a state court if the decision of the state court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Walker v. Martin*, 562 U.S. 307, 315 (2011) (citing *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)) (internal quotations and citation omitted). Without this doctrine, "habeas would offer state prisoners . . . a means to undermine the State's interest in enforcing its laws." *Coleman*, 501 U.S. at 730-31.

"Before accepting a procedural bar defense, a federal court must examine the adequacy of the alleged procedural default," as "state courts may not avoid deciding federal issues by invoking procedural rules that they do not apply evenhandedly to all similar claims." *Cotto v. Herbert*, 331 F.3d 217, 239 (2d Cir. 2003) (citation and quotation marks omitted). "[A] procedural bar will be deemed adequate only if it is based on a rule that is firmly established and regularly followed by the state in question." *Garcia v. Lewis*, 188 F.3d 71, 77 (2d Cir. 1999)

(citations and quotations omitted); *see also Lee v. Kemna*, 534 U.S. 362, 376 (2002) (same).  In certain cases, review is still available if the application of the rule is "exorbitant."  *See Garvey v. Duncan*, 485 F.3d 709, 713-14 (2d Cir. 2007) ("[I]n certain limited circumstances, even firmly established and regularly followed state rules will not foreclose review of a federal claim if the application of the rule in a particular case is 'exorbitant.'") (quoting *Lee*, 534 U.S. at 376).

2.      *Cause and Prejudice*

A state procedural default qualifies as an adequate and independent ground and will preclude federal habeas review "unless the habeas petitioner can show cause for the default and prejudice attributable thereto . . . or demonstrate that failure to consider the federal claim will result in a fundamental miscarriage of justice." *Harris v. Reed*, 489 U.S. 255, 262 (1989) (quotation marks and citations omitted); *accord Coleman*, 501 U.S. at 750.  A petitioner may establish cause by showing "that the factual or legal basis for a claim was not reasonably available to counsel," or that "some interference by officials . . . made compliance impracticable . . . ." *Murray v. Carrier*, 477 U.S. 478, 488 (1986) (quotation marks and citations omitted).  A petitioner may establish prejudice by showing that the error worked to petitioner's "actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Torres v. Senkowski*, 316 F.3d 147, 152 (2d Cir. 2003) (quotation marks and citation omitted). Finally, if the petitioner cannot show cause and prejudice, the procedural default may nonetheless be excused if he can show that a fundamental miscarriage of justice would result from a failure to entertain the claim, *i.e.*, "that he is actually innocent of the crime for which he has been convicted." *Dunham v. Travis*, 313 F.3d 724, 730 (2d Cir. 2002) (citations omitted).

3.      *AEDPA Deference to State Court Decisions on the Merits*

If a claim is exhausted and not procedurally defaulted, I will move on to consider the merits of the claim under the standard set forth in 28 U.S.C. § 2254, as amended by the

Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Under that standard, a federal court may grant habeas relief "with respect to any claim that was adjudicated on the merits in State court proceedings" only if the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. §§ 2254(d)(1)-(2). *See also Rodriguez v. Miller*, 537 F.3d 102, 109-10 (2d Cir. 2007) ("[A] federal court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.") (quoting *Williams v. Taylor*, 529 U.S. 362, 411 (2000)). In addition, a federal habeas court must presume all state court factual determinations to be correct, unless the petitioner rebuts the findings by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

"It is well established that a federal habeas court does not sit to correct a misapplication of state law, unless such misapplication violates the Constitution, laws, or treaties of the United States." *See Ponnapula v. Spitzer*, 297 F.3d 172, 182 (2d Cir. 2002); *see also Downs v. Lape*, 657 F.3d 97, 105 (2d Cir. 2011) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.") (citation and internal quotation marks omitted). Additionally, "[e]rroneous evidentiary rulings do not automatically rise to the level of constitutional error sufficient to warrant issuance of a writ of habeas corpus. Rather, the writ would issue only where petitioner can show that the error deprived her of a fundamentally fair trial." *Taylor v. Curry*, 708 F.2d 886, 891 (2d Cir. 1983).

4.    *Review of Harmless Error*

On habeas review, I use the standard articulated in *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993), to decide whether a state court's determination that a constitutional error

was harmless was correct.  *See McBee v. Burge*, 644 F. Supp. 2d 270, 284 (E.D.N.Y. 2009), *aff'd*, 395 F. App'x 762, 763 (2d Cir. 2010) (*see also Fry v. Pliler*, 551 U.S. 112 (2007)).  The *Brecht* standard allows me to grant a habeas petition only if the petitioner establishes that "the error had a 'substantial and injurious effect or influence in determining the jury's verdict.'" *Glenn v. Bartlett*, 98 F.3d 721, 729 (2d Cir. 1996) (quoting *Brecht*, 507 U.S. at 638 (additional citation omitted)).

The Supreme Court has listed five factors to determine whether a trial court's decision to exclude evidence constituted harmless error:  "(1) the overall strength of the prosecution's case; (2) the importance of the witness's testimony; (3) whether the testimony was cumulative; (4) the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points; and (5) the extent of cross-examination otherwise permitted." *Alvarez v. Ercole*, 763 F.3d 223, 233 (2d Cir. 2014) (quoting *Delaware v. Arsdall*, 475 U.S. 673, 684 (1986) (internal quotations omitted)).

B.      *Borukhova's Claims for Relief*

Borukhova argues that all of the Second Department's findings in its decision affirming her conviction were unreasonable.

1.      *The Sufficiency of the Evidence*

Borukhova argues that the evidence adduced at trial was legally insufficient to find her guilty of murder in the first degree.  *See* Pet. ¶¶ 198-211.  Specifically, she argues that the evidence was legally insufficient to prove an agreement to commit murder in exchange for something "of pecuniary value." Pet. ¶¶ 261-77 (citing Penal Law § 125.27(1)(a)(vi)).  The Second Department rejected Borukhova's claim because it was procedurally defaulted; Borukhova's attorney failed to comply with the state's contemporaneous objection rule. *Borukhova*, 931 N.Y.S.2d at 373.

18

At the close of the prosecution's case, Mallayev's attorney made a motion to dismiss the murder count, specifically arguing that the evidence relating to a financial arrangement or any exchange of money from Borukhova to Mallayev was insufficient to state a prima facie case. Borukhova's attorney made a motion to dismiss the case on the grounds insufficient evidence "with regard to each of the counts" without specifying further. The court denied the motion. T. 3807-09.

The Second Department's decision that Borukhova's claim is unpreserved rests on independent and adequate state law grounds. The procedural ground was independent from the federal question and adequate to support the Second Department's decision. Under New York law, "for an argument concerning the sufficiency of the evidence to be preserved, it must be 'specifically directed' at the alleged error . . . ." *Dixon v. Miller*, 293 F.3d 74, 80 (2d Cir. 2002) (quoting *People v. Gray*, 86 N.Y.2d 10, 19 (1995)) (additional citation omitted). "A general objection is not sufficient to preserve an issue since such would not alert the court to defendant's position." *Garvey v. Duncan*, 485 F.3d 709, 714 (2d Cir. 2007). Additionally, the contemporaneous objection rule is a clearly stated ground for denial of the appeal based on a "firmly established and regularly followed New York procedural rule . . ." *See id.* at 718. (referring to N.Y.C.P.L § 470.05(2)). Borukhova's motion, which was not specifically directed to the elements of the crime the defendant claimed were not established, was not sufficient to preserve Borukhova's claim.

Borukhova argues that Mallayev's objection to the sufficiency of the evidence was sufficient to preserve the issue. But respondent points out that under New York law, the objection of one defendant does not preserve the objection for another. Resp. Br. 59-60 (citing *People v. Buckley*, 75 N.Y.2d 843, 846 (1990); *People v. Jaen*, 983 N.Y.S.2d 837, 837 (2d Dep't

2014) (additional citations omitted)).  Finally, Borukhova has not demonstrated cause or prejudice to overcome the procedural default under the standard articulated above.

Even if Borukhova's claim were not procedurally defaulted, it is meritless.  To overturn a conviction based on insufficiency of the evidence, a defendant must establish that, "viewing the evidence in the light most favorable to the prosecution, [no] rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Dixon*, 293 F.3d at 81 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (additional citation omitted). "A defendant challenging the sufficiency of the evidence supporting his conviction bears a heavy burden . . . ." *Dixon*, 293 F.3d at 81 (internal quotations omitted).

The evidence of the cash deposits by Mallayev into multiple bank accounts in May and November of 2007, together with, *inter alia*, the evidence that he met with Borukhova on those dates, is more than enough for a rational trier of fact to conclude that Borukhova paid Mallayev for shooting Malakov.  Additionally, the large volume of calls exchanged between the two, beginning right after the award of custody to Malakov and ending right after Malakov's death, provided ample circumstantial evidence of an agreement.  Accordingly, Borukhova's claim for habeas relief based on insufficiency of the evidence is denied.

The evidence in support of Borukhova's guilt in this case was overwhelming. Borukhova had a strong motive to orchestrate the killing of her husband, since he was recently awarded custody of their daughter because of Borukhova's interference in Michelle's relationship with him.  Malakov's uncle testified that Borukhova stated that Malakov's days were numbered.  Borukhova exchanged more than 90 calls with Mallayev from the day after the award of custody to Malakov until the day Malakov was killed, with 65 of the calls in the days just prior to the shooting.  Medical records seized from Borukhova's office showed that Borukhova likely falsified records to try to explain the large volume of calls she exchanged with

Mallayev.  Mallayev was identified as the shooter by fingerprints found on the make-shift silencer, descriptions provided by testimony from three eyewitnesses, and cell site information that put Mallayev in the area of the crime scene on the day of the crime.  One of the eyewitnesses also identified Mallayev in a lineup.  About a week after the shooting, Mallayev deposited nearly $20,000 in cash in ATMs just after a meeting with Borukhova.

Finally, Borukhova's account of the shooting (that she did not hear the shots or see the shooter) was unbelievable.  Much more likely is the prosecution's account:  that Borukhova said she did not hear the shots because she knew Mallayev would use a silencer, and because she was late to the park on the morning of the shooting, she did not know that the silencer had failed.  Because she was running late, she sent her sister Sofya to the park, who was identified by two of the eyewitnesses in a photo array.  In short, a reasonable jury could easily have found that Borukhova hired Mallayev to commit Malakov's murder.

2.      *Borukhova's Right to Testify and Present a Defense*

Borukhova takes issue with the Second Department's holding that her constitutional rights to testify and present a defense were not violated when she was not permitted to explain the reason for some of her actions during her direct examination.  *See* Pet. ¶¶ 82-95.  Borukhova argues that this violated her constitutional right to testify on her own behalf, which is rooted in the Fifth Amendment's due process clause and the Sixth Amendment's compulsory process clause.  *Id.* ¶ 123 (citing *Rock v. Arkansas*, 483 U.S. 44, 51-53 (1987)).  She argues that she should have been allowed to explain why she taped a conversation with Mallayev and broke the Sabbath to visit a spy shop where she bought the button camera that the police recovered from Sofya's apartment.  Pet. ¶¶ 111-13.

The Second Department found that Borukhova's rights were not violated because she was permitted to testify as to those actions on both direct- and cross-examination, and her

lawyer argued those reasons in his summation.  *Borukhova*, 931 N.Y.S.2d at 370-71.

Respondent argues that the Second Department's decision was not unreasonable because it is

firmly established under New York law that a witness can testify as to her actions, observations,

and surrounding circumstances but not about the "operation of her mind."  Resp. Br. 142-43

(citing *Abbott v. People*, 86 N.Y. 460, 471 (1881)).  As mentioned above, evidentiary decisions

do not amount to constitutional error unless a petitioner can show she was deprived of a fair trial.

*See Taylor*, 708 F.2d at 891.  Here, there has been no such showing.

   I acknowledge that I may have made a different decision than the one made by the

trial court.  For instance, I agree with Borukhova that once the prosecution was permitted to

cross-examine her regarding breaking the Sabbath to call the Spy Shop after sundown to inquire

about purchasing a button camera, Borukhova should have been permitted to explain on redirect

why she believed her actions were consistent with her religious beliefs.  *See* Pet. ¶¶ 137-38

(citing T. 4386-91).  However, I am mindful that a defendant's right to present relevant evidence

is subject to "reasonable restrictions" and as a result, "state and federal rulemakers have broad

latitude under the Constitution to establish rules excluding evidence from criminal trials" that

"do not abridge an accused's right to present a defense so long as they are not arbitrary or

disproportionate to the purposes they are designed to serve."  *United States v. Scheffer*, 523 U.S.

303, 308 (1998) (internal quotations omitted).  In this case, because Borukhova was not deprived

of a fundamentally fair trial, and because of the overwhelming evidence her guilt, Borukhova's

petition for relief on this ground is denied.

   3.  *Borukhova's Confrontation Clause Claims*

   Borukhova makes several arguments with respect to her rights under the

Confrontation Clause.  First, she contends that the trial court admitted three out-of-court

statements impermissibly.  Next, Borukhova argues that she should have been allowed to

question the police about the omission of "critical" information in their notes and reports. *See* Pet. ¶¶ 140-47. Finally, she argues that her rights to due process, confrontation, and a fair trial were violated when the trial court refused to hold a hearing on the reliability of the prosecution's fingerprint identification evidence and by precluding cross-examination as to the reliability of that evidence. *See id.* ¶¶ 150-55.

As for the three out-of-court statements, Borukhova argues that the trial court improperly admitted into evidence the statements (1) from Malakov to Khaika on the day of the murder that Borukhova had asked Malakov to bring Michelle to the park; (2) from Sofya to Khaika, saying that if the Malakov family did not give Michelle back, they would lose Malakov; and (3) the decision from the Family Court judge awarding custody to Malakov and explaining Borukhova's efforts to prevent Michelle from bonding with Malakov. Borukhova contends that all of these statements were improper hearsay and, if they were to be admitted at all, they had to be accompanied by limiting instructions.

The Supreme Court has clearly established a criminal defendant's Sixth Amendment right to "a meaningful opportunity to cross-examine witnesses against him." *Alvarez v. Ercole*, 763 F.3d 223, 229-30 (2d Cir. 2014) (citing *Pennsylvania v. Ritchie*, 480 U.S. 39, 51 (1987)). However, "[t]he Confrontation Clause does not . . . guarantee unfettered cross-examination." *Alvarez*, 763 F.3d at 230 (citing *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (per curiam)). Instead, a trial court retains broad discretion to impose reasonable limits on cross-examination. *Alvarez*, 763 F.3d at 230 (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1985) (additional citation omitted). On habeas review of a claim for denial of Confrontation Clause rights, the Second Circuit has said:

> Combining the standard for restricting cross-examination with the
> AEDPA standard, in order to grant a habeas petition we would
> have to conclude not only that the trial court abused its broad

discretion by precluding cross-examination but also that the state appellate court could not reasonably have determined that the evidence would have been excludable had the trial court properly applied standard rules of evidence.

*Alvarez*, 763 F.3d at 230 (internal quotations and alterations omitted).

The Second Department found that Khaika's testimony about Borukhova wanting Malakov to bring Michelle to the park was properly admitted under the state-of-mind exception to the hearsay rule. *Borukhova*, 931 N.Y.S.2d at 369. It found that it was error for the trial court to admit Khaika's testimony about Sofya without an instruction to the jury that it could be considered only as proof of the conspiracy charge. However, the Second Department said the error was harmless in light of the overwhelming evidence of Borukhova's guilt. *Id.* at 368-69. Finally, the Second Department decided that reading the Family Court's decision into the record was proper under the state-of-mind exception for the purposes of establishing its effect on Borukhova. *Id.* at 370.

I agree with the Second Department's decisions to the extent they implicate Borukhova's federal constitutional rights. Under the standard articulated in *Brecht* with respect to harmless error, even if the statements were improperly admitted into evidence, the errors were harmless because of the overwhelming proof of Borukhova's guilt.

The Second Department did not specifically rule on Borukhova's argument concerning cross-examination of the police officers about omissions in their notes. The trial court decided that the cross-examination was improper under the state court precedent in *People v. Bornholdt*, which held that a witness's attention must be specifically "called to the matter" before he may be impeached because of an omission. 33 N.Y.2d 75, 88 (1973). Borukhova argues that *Bornholdt* does not apply to impeachment of police officers. *See* Pet. ¶ 144. I defer to the trial court's evidentiary ruling on this matter of state law. *See Ponnapula*, 297 F.3d at 182;

*see also Crane v. Kentucky*, 476 U.S. 683, 689 (1986). Additionally, there is no indication that the trial court's decision was so unreasonable as to amount to a constitutional violation. The Confrontation Clause does not guarantee "cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Fensterer*, 474 U.S. at 20.

I cannot say that the state court's determinations constituted an unreasonable application of clearly established Supreme Court precedent. Moreover, any error was harmless in light of the overwhelming evidence of Borukhova's guilt.[4]

Finally, the Second Department found that Borukhova's Confrontation Clause argument about holding a hearing on the reliability of the fingerprint expert was unpreserved for appellate review. *Borukhova*, 931 N.Y.S.2d at 373. I disagree that the argument was unpreserved, as Borukhova joined in Mallayev's motion for a hearing on the reliability of the expert testimony. *See* A. 250. The trial court also noted that Borukhova joined in Mallayev's motion for a hearing under *Daubert* or *Frye*. *See* A. 28. The trial court denied the defendants' motion in limine because "latent fingerprint analysis is not a novel scientific procedure that would fall within the ambit of the *Frye* rule and it is admissible without a hearing." A. 29. This was not an unreasonable determination of federal constitutional law as determined by the Supreme Court. *See United States v. Stevens*, 219 F. App'x 108, 109 (2d Cir. 2007) (*Daubert* hearing not required for fingerprint evidence because the "reliability of an expert's methods is properly taken for granted." (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). Therefore, habeas relief on this ground is denied. Borukhova's claim for habeas relief based on the cross-examination of the fingerprint expert is also denied; the trial court was authorized to

---

[4]     I also note that whether Officers Danielle or Irving noted Borukhova's demeanor in their initial encounters with her was not so important as to deprive Borukhova of evidence essential to her defense. Instead, Borukhova was able to present testimony from EMT Marin to contradict the officers' testimony.

impose reasonable limits on cross-examination, and those limits were not exceeded in this case. *See Alvarez*, 763 F.3d at 230 (citing *Van Arsdall*, 475 U.S at 679).

4.      *Borukhova's Statements to the Police*

Borukhova argues that the Second Department's determination that her statements at the precinct should have been suppressed as a violation of her right to counsel, but not as a violation of her *Miranda* rights – but any error was harmless – was unreasonable. *See* Pet. ¶¶ 143-59. First, Borukhova contends that the Second Department's decision that she was not in custody for *Miranda* purposes was unreasonable because a reasonable person in Borukhova's position would not have believed she was free to leave. Pet. ¶¶ 210-12.

Generally, a suspect is entitled to Miranda warnings only if he or she is interrogated while "in custody." *Parsad v. Greiner*, 337 F.3d 175, 181 (2d Cir. 2003) (citing *Thompson v. Keohane*, 516 U.S. 99, 102 (1995)). As explained in *Parsad*:

> The Supreme Court has held that two discrete inquiries are involved in determining whether a person was in custody. First, we consider the circumstances surrounding the interrogation. As this is purely an issue of fact . . . we presume that the state courts' findings are correct . . . . We then determine whether, given those circumstances, a reasonable person would have felt at liberty to terminate the interrogation and leave, which is a mixed question of fact and law.

*Parsad*, 337 F.3d at 181-82 (citing *Thompson*, 516. U.S. at 112-13) (additional citations and internal quotations omitted). The Second Circuit has found that, on habeas review, "unless the facts clearly establish custody, a state court should be deemed to have made a reasonable application of clearly established Supreme Court law in concluding that custody for *Miranda* purposes was not shown." *Cruz v. Miller*, 255 F.3d 77, 86 (2d Cir. 2001).

The Second Department's decision that Borukhova was not in custody for purposes of *Miranda* when she was questioned at the hospital and then the police station was not

unreasonable.  *See* 931 N.Y.S.2d at 363.  The facts adduced at trial do not clearly establish that a reasonable person would not have felt free to leave.  Officer Irving testified that she stayed with Borukhova at the hospital to make sure she was okay.  Detective Hoxha established that she interviewed Borukhova as a witness to a homicide.  Hoxha testified that Borukhova did not ask for a lawyer during the interview and did not ask to leave or refuse to answer questions.  Irving testified that although she asked for a police car to take Borukhova to the precinct, it was necessary because Irving and Borukhova arrived at the hospital via ambulance.  When she arrived at the precinct, Irving brought Borukhova to a public waiting area and left her unsupervised while she waited to be interviewed.  *See* Resp. Br. at 44-46.

The officers' testimony was consistent with a conclusion that Borukhova was not in custody.  Additionally, the Second Department's decision appears to be consistent with the Second Circuit's interpretation of Supreme Court precedent.  *See, e.g.*, *United States v. Wallace*, 178 F. App'x 76, 79 (2d Cir. 2006) ("[T]here is no requirement that the *Miranda* warning be given merely because the interview takes place at the police station."); *Gren v. Greiner*, 89 F. App'x 754, 757 (2d Cir. 2004) (state court's decision that petitioner was not in custody for purposes of *Miranda* was reasonable when he was recovering from injuries, not handcuffed, and asked a limited number of questions).

Borukhova also asserts that the statements were made in violation of her right to counsel.  The Second Department agreed with this argument.  It found that Borukhova's right to counsel attached at 1:17 p.m. on the day of the murder when the attorney retained by Borukhova's sister called the police station and identified himself as Borukhova's lawyer.  931 N.Y.S.2d at 365.  However, the court went on to conclude that the error was harmless because "there is no reasonable possibility that the jury would have acquitted her had it not been for this constitutional error."  *Id.* at 366 (internal citations omitted).  Even assuming that the facts made

out a violation of Borukhova's *federal* right to counsel (as opposed to a violation of her right under New York law), I agree that the error was harmless because of the overwhelming evidence of Borukhova's guilt, as explained in detail above.

5. *Borukhova's Claim of Prejudice from a Joint Trial*

Borukhova contends that she was prejudiced by the court's decision to have a joint trial because it created a substantial risk that the jury would consider Mallayev's statements (properly admitted against Mallayev) in determining Borukhova's guilt. *See* Pet. ¶¶ 160-78. Mallayev's statements consisted of his account of his activities on the day of the shooting, which was that he drove to New York to visit a friend and then stopped at his daughter's house in Brooklyn on the way back to Georgia. Mallayev said there were 65 calls exchanged between his phone and Borukhova's phone between October 21, 2007, and October 26, 2007, "[b]ecause of my wife's teeth problems with hot and cold sensitivity, my wife's high blood pressure and the results from my wife's blood work and my cardiogram." The judge gave the jurors a limiting instruction that said the statements could be used as evidence only against Mallayev and not against Borukhova. T. 2563-68. The Second Department did not address this argument specifically in its decision. However, it found that Borukhova's "remaining contentions" were meritless. *See Borukhova*, 931 N.Y.S.2d at 373.

The appellate court's decision here is entitled to AEDPA deference. *See* 28 U.S.C. § 2254(d)(1). As respondent points out (*see* Resp. Br. at 100), the Supreme Court has not considered the question of when severance of a defendant's trial is constitutionally mandated or "how a federal habeas court should review a state court's denial of a severance motion." *Williams v. Moscicki*, No. 10-CV-5918 (DLI)(LB), 2014 WL 1277400, at *7 (E.D.N.Y. Mar. 27, 2014) (internal quotations omitted). However, "habeas relief may be available if the denial of

severance was so prejudicial that it denied petitioner's right to a fair trial." *Id.* (citing *Grant v. Hoke*, 921 F.2d 28, 31 (2d Cir. 1990) (additional citations omitted)).

In *Williams*, the court summarized other cases from within the Second Circuit that establish a joint trial is only fundamentally unfair when the codefendants "present mutually antagonistic defenses" or where "the jury in order to believe the core of testimony offered on behalf of [one] defendant, must necessarily disbelieve the testimony offered on behalf of his co-defendant." *Williams*, 2014 WL 1277400, at *7 (internal quotations omitted) (citing cases). *See also People v. Mahboubian*, 74 N.Y.2d 174, 184 (1984) (test for "irreconcilable conflict" includes that there is a significant danger that the conflict alone would lead jury to infer defendant's guilt). I agree with respondent that there was no conflict between Borukhova and Mallayev's defenses, and the appellate court reasonably rejected her severance claim.

Borukhova also argues that under the Supreme Court's decision in *Bruton v. United States*, her Confrontation Clause rights were violated when Mallayev's statement was admitted into evidence and he did not testify. *See* Pet. ¶¶ 229-38. In *Bruton*, the Supreme Court held that even after giving the jury a limiting instruction, the introduction of one co-defendant's incriminating statement violates the other co-defendant's Confrontation Clause rights when the first co-defendant does not testify. 391 U.S. 123, 136-37 (1968). Borukhova argues that even when statements do not inculpate or even mention the co-defendant, they may violate the *Bruton* rule. *See* Pet. ¶¶ 229-30. However, she acknowledges that the *Bruton* rule was limited by the Supreme Court in *Richardson v. Marsh*, where the Court held that *Bruton* does not apply to statements that are not incriminating of others on their face, and become so "only when linked with evidence later introduced at trial." 481 U.S. 200, 208 (1987). *See also United States v. Wilkinson*, 754 F.2d 1427, 1435 (2d Cir. 1985) ("A defendant's *Bruton* rights would be violated,

however, only if the statement, standing alone, would clearly inculpate him without introduction of further independent evidence.").

For these reasons, Borukhova has not shown that the appellate court's decision was contrary to or an unreasonable application of Supreme Court precedent.

6.      *The Suppression of the Microcassette Recorder and Recording*

Borukhova argues that the trial court should have suppressed the microcassette recorder found in her apartment and the recording obtained from it. *See* Pet. ¶¶ 179-92. Borukhova's motion to suppress the recorder and the recording was denied before trial. A. 21-23. This argument was not addressed by the Second Department. However, Fourth Amendment claims are barred from habeas review so long as the state provided the petitioner with an opportunity to fully and fairly litigate the claim. *See Stone v. Powell*, 428 U.S. 465, 482 (1976).

"[R]eview of fourth amendment claims in habeas petitions [may] be undertaken in only one of two instances: (a) if the state has provided no corrective procedures at all to redress the alleged fourth amendment violations; or (b) if the state has provided a corrective mechanism, but the defendant was precluded from using that mechanism because of an unconscionable breakdown in the underlying process." *Capellan v. Riley*, 975 F.2d 67, 70 (2d Cir. 1992). An "unconscionable breakdown" means that the state court "failed to conduct a reasoned method of inquiry into relevant questions of fact and law." *Id.* at 71 (internal quotations omitted). Because Borukhova litigated the issue in a motion to suppress and challenged the state court's ruling on direct appeal, she cannot claim that she lacked a full and fair opportunity to litigate her claim.

Borukhova also argues that the trial court should not have allowed the seized recording into evidence because it was not audible. Because this is an evidentiary decision on a state-law matter, it is not available for habeas review unless Borukhova can show that it constituted a violation of federal law. *See Ponnapula*, 297 F.3d at 182. There is no indication

here that the trial judge's ruling amounted to a violation of Borukhova's right to a fair trial. "For a habeas petitioner to prevail on a claim that an evidentiary error amounted to a deprivation of due process, he must show that the error was so pervasive as to have denied him a fundamentally fair trial." *Brathwaite v. Duncan*, 271 F. Supp. 2d 400, 402 (E.D.N.Y. 2003) (citing *United States v. Agurs*, 427 U.S. 97, 108 (1976)). As respondent points out, the trial court made an informed judgment about the audibility of the tape after several interpreters produced transcripts of it. *See* T. 3662-63. This decision is not a violation of federal law, and thus it is not a proper basis for habeas relief.

7.     *Borukhova's Claim of Judicial Bias*

        In her motion to set aside the verdict, Borukhova argued that the trial judge should have recused himself because his two children worked for the Queens County District Attorney. Borukhova argues that the judge's refusal and subsequent denial of her motion to set aside the verdict on those grounds was in error. *See* Pet. ¶¶ 256-60. Borukhova moved to recuse the judge before trial on the grounds of bias, and the trial judge denied the motion. *Id*. ¶ 257. She also raised this argument in a § 330.30 motion after trial, arguing that the verdict should be set aside because the judge had a conflict of interest because of his ties to the District Attorney's Office. The court denied the motion. *Id.* Borukhova again raised this argument on appeal, and the Second Department summarily denied appellate relief on this ground by finding that Borukhova's "remaining contentions are without merit." *Borukhova*, 931 N.Y.S.3d at 373.

        Respondent argues that the judge's refusal to recuse himself is a matter of state law and does not present a question of Borukhova's federal constitutional rights. Resp. Br. at 150. Indeed, an allegation that a judge made a disproportionate number of adverse rulings is sufficient to question a judge's impartiality only in the "rarest circumstances." *Liteky v. United States*, 510 U.S. 540, 555 (1994). "[J]udicial rulings alone almost never constitute a valid basis

for a bias or partiality motion." *Id.* Borukhova does not come close to meeting this standard. Her allegations of judicial bias relate to the trial court's evidentiary rulings and decision to have defense counsel sum up on the day after the close of the evidence, which, as discussed above, were based on the judge's weighing of the evidence and other factors relevant to his analysis. Her argument that the judge should have recused himself because his children work for the Queens District Attorney's Office is meritless. There is no evidence that the judge exhibited "such a high degree of favoritism or antagonism as to make fair judgment impossible." *Id.* Accordingly, habeas relief on this ground is denied.

### 8. *Borukhova's Right to a Public Trial*

Borukhova argues her right to a public trial was violated when the court excluded observers from the courtroom during voir dire. *See* Pet. ¶¶ 279-90. Indeed, the Supreme Court has found that the right to a public trial extends to the voir dire of prospective jurors. *Presley v. Georgia*, 558 U.S. 209, 213 (2010). However, the appellate court found that Borukhova's claim was procedurally barred because she did not raise any objection to the temporary closure of the courtroom during voir dire. *Borukhova*, 931 N.Y.S.3d at 373. Borukhova agrees there is no evidence in the record that her counsel objected to the exclusion of observers. Pet. ¶¶ 282-83. New York state law requires that a defendant must raise a claim of denial of the right to a public trial before the trial court. *See People v. Alvarez*, 20 N.Y.3d 75, 81 (2012) ("We have consistently required that errors of constitutional dimension – including the right to a public trial – must be preserved.") (internal citations omitted).

The state court decision rejecting this claim rested on independent and adequate state law grounds, as the contemporaneous objection rule is firmly established under New York law. Borukhova has established neither cause nor prejudice for the procedural default. For these reasons, her petition for habeas relief on this ground is denied.

9.     *Borukhova's Right to Counsel*

Borukhova argues that her right to effective assistance of counsel was violated because her attorney did not have enough time to prepare his closing arguments. *See* Pet. ¶¶ 176-94. As Borukhova explains, her counsel requested that he be permitted to make his closing argument on Monday instead of Friday, the day after the close of testimony. That request was denied, but the prosecutor was allowed to close on Monday. Borukhova asserts that her attorney relied on a statement from the judge's law secretary that he would be permitted to sum up on Monday so he would have the weekend to prepare. *See id.* ¶ 169.[5]

The Second Department found that it was not a violation of Borukhova's right to counsel for the trial court to require Borukhova's counsel to sum up the day after the close of the evidence. *Borukhova*, 931 N.Y.S.3d at 371. The Supreme Court has found that "broad discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay violates the right to the assistance of counsel." *Morris v. Slappy*, 461 U.S. 1, 11-12 (1983) (internal quotations omitted); *see also Sanusi v. Gonzales*, 445 F.3d 193, 199 (2d Cir. 2006) ("A district court has "largely unfettered discretion . . . to deny or to grant a continuance.").

From my review of the record, the trial judge made it clear that his decision to require defense counsel to make closing arguments on Friday rather than wait until Monday was based on his balancing of the needs of the court, the jurors' needs, and Borukhova's religious beliefs that prohibited her from traveling after sundown. Additionally, there was no basis to conclude that Borukhova's attorney's performance constituted ineffective assistance of counsel

---

[5]     Borukhova explains that her counsel suggested that as a compromise, both parties be required to sum up on Friday, and he convinced her to make an exception to her religious beliefs and stay late on Friday to accommodate that schedule. Although the court initially accepted this proposal, the judge changed his mind and said he would not accept Borukhova's waiver of her religious beliefs. Pet. ¶¶ 174-76. As a result, defense counsel had to sum up on Friday, but the prosecution was permitted to make closing arguments the following Monday.

under the standard articulated in *Strickland v. Washington*, 466 U.S. 668 (1984). *See Harrington v. Richter*, 562 U.S. 86, 104, 787 (2011) ("The challenger's burden is to show 'that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.'") (quoting *Strickland*, 466 U.S. at 687). Additionally, there is no indication that the lack of preparation time had any influence on the jury's verdict, especially in light of the overwhelming evidence of guilt. Therefore, Borukhova's petition for habeas relief on this basis is denied.

          10.    *Borukhova's Claim of Cumulative Error*

Borukhova incorporates the argument from her appellate brief that "the cumulative effect of the constitutional and non-constitutional errors rendered this trial so fundamentally unfair, the conviction must be vacated." Pet. ¶ 278 (citing Def. App. Br. at 124-26). Neither Borukhova's appellate brief nor this habeas petition cite to Supreme Court law that establishes a violation of Borukhova's constitutional rights on this basis. Additionally, for the reasons explained above including the overwhelming evidence of Borukhova's guilt, any claim that she was denied her right to a fair trial is denied.

CONCLUSION

For the reasons stated above, Borukhova's petition is denied. Because she has failed to make a substantial showing that she was denied a constitutional right, no certificate of appealability shall issue.

So ordered.

John Gleeson, U.S.D.J.

Dated: September 10, 2015
      Brooklyn, New York